## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                              )
MORTIMER OFF SHORE SERVICES,                  )
LTD. and RONNIE FULWOOD,                      )
                                              )
Plaintiffs,                                   )
                                              )
v.                                            )        Case No. 10-11551
                                              )
FEDERAL REPUBLIC OF GERMANY,                  )
NORDDEUTSCHE LANDESBANK                        )
GIROZENTRALE, HSH NORDBANK AG,                 )
WESTLB AG, HELABA LANDESBANK                   )
HESSEN-THUERINGEN, and LBBW                    )
LANDESBANK BADEN-                             )
WUERTTEMBERG                                   )
                                              )
Defendants.                                   )
_____)

## COMPLAINT

Plaintiffs Mortimer Off Shore Services, Ltd. and Ronnie Fulwood,

by their attorneys, for their Complaint against Defendants Federal

Republic of Germany, Norddeutsche Landesbank Girozentrale, HSH

Nordbank AG, WestLB AG, Helaba Landesbank Hessen-Thueringen,

and LBBW Landesbank Baden-Wuerttemberg, state as follows:

## NATURE OF THE ACTION

1.     This action is brought by Mortimer Off Shore Services, Ltd. ("Mortimer") and Ronnie Fulwood ("Fulwood") to recover from the Defendant Federal Republic of Germany ("Germany") and the successors of certain German provincial and communal banks the outstanding and unpaid principal and interest on 1,694 bearer bonds in their possession that were guaranteed, succeeded to, and assumed by German provincial and federal governments.

2.     Germany is liable on the bonds under a written guaranty, under explicit assumptions and declarations, and as a successor obligor and guarantor under United States and international law.

3.     The bonds were payable in the Commonwealth of Massachusetts, marketed in the United States, and listed on the New York Stock Exchange.  Germany and the obligor banks have been in default for many years, but Germany has engaged in highly sophisticated and complex schemes over the years to avoid, resist, or defer its liabilities and obligations on the bonds.

4.     Five years after the bonds were issued, Germany placed a moratorium on payment, which it strategically used to defer external debts in the march to World War II.   Following the war, Germany convinced the United States and other nations to enter into an agreement on the debt on the basis of alleged looting by the Soviet Union that either never occurred or that Germany later confirmed and agreed was lawful.   This agreement deferred for two generations the claims of creditors who chose not to allow Germany and other obligors to renegotiate their debt, until all assenters under the settlement offers had been paid.   Germany also enacted a validation scheme that was allegedly to determine the bonds' enforceability, but was in fact nothing more than a mechanism to deny legitimate claims.   Germany has dissolved and has not lawfully reconstituted the validation board created by this scheme.

5.     Having benefitted from avoiding, resisting, or deferring its obligations on the bonds, this action seeks to require Germany and the successors of numerous obligor banks to honor their legal and contractual obligations to pay the bonds in full.

PARTIES

6.      Plaintiff Mortimer is a company organized under the laws of Cyprus with a place of business at 22 Tempon Street, Engomi 2408, Nicosia, Cyprus.  Mortimer is the good faith purchaser and holder of 1611 bearer bonds, entitled German Provincial & Communal Bank Consolidated Agricultural Loan US$1000 Secured Sinking Fund Gold Bonds Series A 6-1/2%—Due June 1958 ("Bonds").

7.      Three hundred and fifty-one of Mortimer's Bonds were the subject of suit in *Mortimer Off Shore Services, Ltd. v. Federal Republic of Germany*, No. 05-cv-10669 (S.D.N.Y.), Nos. 08-1783-cv (L), 08-2358-cv (XAP) (2d Cir.).  The Court in that case did not consider claims asserted here related to these Bonds, including whether Mortimer could recover under a separate written guaranty agreement which has only recently been discovered.

8.      Fulwood is a Resident of the State of Florida who resides at 5611 S. Sherwood Ave., Unit No. 1, Tampa, FL 33611.  Fulwood is the good faith purchaser and holder of 83 Bonds.

- 4 -

9.     Defendant Germany is a foreign state as defined in the Foreign Sovereign Immunities Act, 28 U.S.C. §1603(a).  Germany has a place of business located at Federal Ministry of Finance, Wilhelmstraße 97, 10117 Berlin, Germany.  Germany is identical to the pre-World War II German Reich and is the legal successor to its political subdivisions, including the State of Prussia ("Prussia"), as well as the German Democratic Republic ("East Germany").

10.     Defendant Norddeutsche Landesbank Girozentrale is a German corporate entity with a place of business at 1114 Avenue of the Americas, 37th Floor, New York,  NY 10036.  Defendant Norddeutsche Landesbank Girozentrale is the successor to Hannoveresche Landeskreditanstalt, one of the original issuers of the Bonds. Defendant Norddeutsche Landesbank Girozentrale has engaged in commerce with respect to the Bonds that directly affects the Commonwealth of Massachusetts.

11.     Defendant HSH Nordbank AG is a German corporate entity with a place of business at 590 Madison Avenue, 28th Floor, New York, NY  10022-2540.  Defendant HSH Nordbank AG is the successor to

Landesbank der Provinz Schleswig-Holstein, one of the original issuers of the Bonds.  Defendant HSH Nordbank AG has engaged in commerce with respect to the Bonds that directly affects the Commonwealth of Massachusetts.

12.   Defendant WestLB AG is a German corporate entity with a place of business at 1211 Avenue of the Americas, New York, NY 10036.  Defendant WestLB AG is the successor to Landesbank der Rheinprovinz and Landesbank der Provinz Westfalen, two of the original issuers of the Bonds.  Defendant WestLB AG has engaged in commerce with respect to the Bonds that directly affects the Commonwealth of Massachusetts.

13.   Defendant Helaba Landesbank Hessen-Thueringen is a German corporate entity with a place of business at 420 Fifth Avenue, New York, NY  10018.  Defendant Helaba Landesbank Hessen-Thueringen is the successor to Nassauische Landesbank, one of the original issuers of the Bonds.  Defendant Helaba Landesbank Hessen-Thueringen has engaged in commerce with respect to the Bonds that directly affects the Commonwealth of Massachusetts.

14.    Defendant LBBW Landesbank Baden-Wuerttemberg, is a German corporate entity with a place of business at 280 Park Avenue, 31st Floor, West Building, New York, NY   10017.   Defendant LBBW Landesbank Baden-Wuerttembergis is the successor to Badischer Sparkassen-und Giroverband and Wuerttembergischer Sparkassen-und Giroverband, two of the original issuers of the Bonds.   Defendant LBBW Landesbank Baden-Wuerttemberg has engaged in commerce with respect to the Bonds that directly affects the Commonwealth of Massachusetts.

15.    Collectively,    Defendants    Norddeutsche    Landesbank Girozentrale, HSH Nordbank AG, WestLB AG, Helaba Landesbank Hessen-Thueringen, and LBBW Landesbank Baden-Wuerttemberg are referred to in this Complaint as the "Defendant Issuing Banks."

16.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1330 and principles of supplemental jurisdiction because this action is brought against a foreign state.

17.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(f) because the action is against a foreign state and a substantial

part of the events or omissions giving rise to the claims occurred within this district.   Certain defendants may be found in this district and others may be sued in this district based upon their actions or status as aliens.

STATEMENT OF FACTS

A.     <u>The Bonds</u>.

18.   The Bonds were issued on or about June 1, 1928 in an authorized aggregate face amount of US $25,000,000.  The Bonds were listed on the New York Stock Exchange and marketed in New York.

19.   The Bonds were issued as part of a German national program for improving agricultural conditions.  Fourteen provincial and communal banks participated in the operation of contracting for the loans underlying the issuance of the Bonds and relending the proceeds to farmers.

20.   The Bonds had a 30-year term and interest coupons providing for interest payments at the rate of 6 ½% per annum due on June 1 and December 1 of each year.  Both principal and interest were

payable in Boston, Massachusetts, in the Borough of Manhattan in the City of New York, or in Chicago, Illinois.

21.     The Bonds are bearer instruments that entitle the holder to payment upon demand.

22.     The Bonds have not been canceled, perforated, voided, or otherwise modified.

23.     Each Bond has a US $1000 face amount which, under the gold clause in each Bond, represents the equivalent value in gold coin of the United States existing on June 1, 1928.  Interest amounts are also payable in the equivalent value in gold coin of the United States existing on June 1, 1928.

24.     The Bonds contain coupons from December 1944 though maturity on June 1, 1958.

25.     The Bonds are the obligations of fourteen German provincial and communal banks and their guarantors and successors.  Each obligor bank is responsible for a portion of the debt on each Bond proportionate to its share of the total proceeds of the underlying loan as follows:

(1) Landesbank der Provinz Ostrepreussen          29%

(2) Hannoversche Landeskreditanstalt              14.5%

(3) Provinzialbank Pommern                        10%

(4) Landesbank Der Provinz Schleswig Holstein     8%

(5) Provinzialhilfskasse Für Die Provinz

    Niederschlesien                               7%

(6) Brandenburgische Provinzialbank Und Gir

    Zentrale                                      7%

(7) Sachsische Provinzialbank                     5.5%

(8) Provinzialbank Oberschlesien                  4%

(9) Landesbank Der Rheinprovinz                   3%

(10) Landesbank Der Provinz Westfalen             3%

(11) Provinzialbank Grenzmark Posen

    Westpreussen Giro-Zentrale                    2%

(12) Nassauische Landesbank                       2%

(13) Badischer Sparkassen-Und Giroverbank         3%

(14) Wurttembergisher Sparkassen Und

    Giroverband                                   <u>2%</u>

<u>100%</u>

26.     Prussia expressly guaranteed payment on the Bonds.

27.     Some of the obligors were located in what later became known as West Germany, and some were located in East Germany.

B.      <u>Germany And Its Political Subdivisions Guaranteed The Bonds In The Period Before World War II As Part Of Their Scheme To Profit From Germany's Default</u>.

28.     At the time of issuance of the Bonds, each German provincial and communal bank was owned in whole or in part by a German province and each province was legally responsible for all obligations of its bank.

29.     In 1933, the German government, under National Socialist control, issued a moratorium on payment under the Bonds.   After Germany issued the moratorium, it began repurchasing Bonds, which it either cancelled, transferred, sold, or otherwise disposed of for value.

30.     The Golddiskontbank was the principal agent Germany used to repurchase the Bonds and other securities.   The Golddiskontbank maintained a register of the Bonds it acquired.   Germany currently

possesses this register, which can be used to determine whether a particular bond was repurchased by Germany during this time.

31.    In October 1938, Germany issued a written guarantee of payment on all principal and interest.  Germany agreed to "fulfill the obligations . . . for proportionate payment of interest and amortization of the loans as well as other claims performable in favor of the [obligors] to the extent that such obligations and claims are not covered by payments made by the obligors."  This guarantee benefitted Germany and the bond issuers.  The guarantee allowed the bond issuers to reduce their interest and to protect their exposure against possible default.  In return, Germany profited from its program of repatriating the Bonds.  Germany benefited from arbitrage caused by dollar devaulations after the bond issuance.

C.    <u>World War II</u>.

32.    Germany commenced World War II with its invasion of Poland in 1939.

33.    Germany has claimed that during the war, it kept the Bonds it repurchased in the 1930s for retirement purposes in the Reichsbank

central vault without ever cancelling them. Germany has also represented that Russian soldiers looted these repurchased bonds during its occupation of Berlin. If this confiscation ever occurred, Soviet authorities returned the Bonds to Germany in 1950. In addition, Germany expressly agreed in the Treaty on the Final Settlement With Respect to Germany that any and all Soviet Union action with respect to the Bonds was confirmed as unequivocally lawful.

34. After the Allies defeated Germany, Germany was split into four (4) zones governed respectively by France, the Soviet Union, the United Kingdom, and the United States. The Allied Powers expressly refused to annex Germany following its defeat, which would have been necessary to end the German state.

D. Germany Reaffirms Its Liability For The Bonds Following World War II.

35. Following World War II, West Germany sought to restore its status as a member of the community of nations. In the Allied Conference in New York on September 23, 1950, the Allied High Commission demanded a formal declaration from Germany accepting its pre- and post-war external debts.

- 13 -

36.    In response to the Allied High Commission's demand, Chancellor Konrad Adenauer of Germany made a formal, binding representation to the Allied High Commission on March 6, 1951, that: "The Federal Republic hereby confirms that it is liable for the pre-war external debt of the German Reich, including those debts of other corporate bodies subsequently declared liabilities of the Reich . . . ."

37.    Chancellor Adenauer's representation to the Allied High Commission was an official act of the German government that was done in consultation with Germany's legislative body.   Chancellor Adenauer intended that his representation have the force and effect of law.

E.    <u>The London Debt Accord Creates A Voluntary Priority Scheme For Holders Of German External Debts</u>.

38.    In 1951, Germany, the United States, and twenty-two other creditor countries subsequently entered into negotiations to address Germany's external debt.

39.    During this time, there was an International Conference on German External Debts.  This body recommended that the framework

for an ultimate agreement on German debts encourage parties to settle
their obligations:

> The basis of the settlements foreseen [] is an offer
> made or to be made by the debtor to the creditor.
> Such offer, even if recommended by the creditor
> representatives, or resulting from arbitration . . .
> may be refused by the creditor, in which case the
> benefit of the Settlement Plan cannot be claimed
> by him.

40.    In 1952, the parties signed a multilateral agreement known
as the "London Debt Accord."   The London Debt Accord created a
strictly voluntary program whereby creditors received offers and could
settle the outstanding obligations, obtaining payment on discounted
terms.   Under the system, German debtors and creditor committees
would  negotiate  an  "offer  and  settlement"  for  the  various  debt
instruments covered by the London Debt Accord.

41.    Any bondholder who wished to accept the offer was required
to have his bond "validated" by a Validation Board in the United States
or Germany.   West Germany reconfirmed its assumption of Prussian
debt in a statute known as the Validation Law, which was designed to
implement the London Debt Accord's voluntary settlement scheme for

assenting creditors.   The Validation Law established that creditors should look to Germany for payment on Prussia's pre-World War II external debt, rather than individual *länder*.

42.     The London Debt Accord did not require individual creditors to accept the settlement offer negotiated by a creditor's respective committee.   Bondholders who chose not to accept the settlement offer were, however, prevented by the London Debt Accord system from bringing an action to recover on these bonds until after all creditors who accepted the settlement offer were paid in full.   The benefit of a London Debt Accord resolution was expeditious payment, but no creditor was required to avail itself of that opportunity.   Any other outcome would have constituted an unlawful attempt to unilaterally modify the enforceable Bond terms.

43.     The London Debt Accord also did not cover all Germany's external debt.   The London Debt Accord did not apply to debt originating from issuers located outside the territory of the Federal Republic of Germany in 1953.   The London Debt Accord's applicability was triggered by the location of the obligor.   As such, the London Debt

Accord could apply to obligors located in what was then West Germany, whereas obligors located outside what was then West Germany were not covered.

44.    The Foreign Bondholders Protection Council ("FBPC"), a quasi-public agency established by the United States government ostensibly to protect American holders of foreign Government bonds, confirmed the voluntary nature of the London Debt Accord, as well as its limited geographic scope, in testimony before the Senate Foreign Relations Committee and in its public representations.

F.    <u>The United States And Germany Enter Into Treaties To Implement The London Debt Accord</u>.

45.    In 1953, the United States and Germany entered into a bilateral treaty to implement the terms of the London Debt Accord.  The 1953 Treaty's purpose was to assure "that claims prejudicial to [] settlement will not be asserted on the basis of bonds which were unlawfully acquired."  The Treaty did not bar any creditor from asserting his or her rights, but rather was intended to ensure that Germany settled and paid claims on validated bonds before satisfying other obligations.

46.    As with the London Debt Accord, the 1953 Treaty did not apply to obligations originating with debtors who were outside the territory of West Germany.   The Secretary of State explained at the time that "the debt negotiations have been carried on with the Federal Republic of Germany and [have] related only to the debts of West Germany."   The Department of State also interpreted the Validation Law as containing "a jurisdictional" limitation because it "does not apply to dollar bonds issued by public or corporate entities having their seat in that part of Germany which is under Soviet control or Polish administration."

47.    Published media reports confirm the voluntary nature of the London Debt Accord and the 1953 Treaty.   In a October 27, 1958 article, the *New York Times* explained the situation that holders of German debt faced:

> The rights of non-assenting bondholders were protected explicitly in the international convention that formulated the London debt settlement, in the treaty enacted between Germany and the United States, and in a subsequent law enacted by West Germany to implement the treaty. . . .   However, such legislation stipulated that no payments could be

made to non-assentees unless settlements arrived
at under the London agreement had been
completed.  In some circles, this commitment of
Germany has been taken to mean that non-
assentees must wait for payment at the original
contractual debt rate until all bonds extended
under the London settlement formula had been
paid off.  This might be 1980 or later.

48.    In 1960, the United States and Germany entered into a
second bilateral treaty that extended the London Debt Accord and 1953
Treaty to certain debt instruments that were previously not covered.
Like the 1953 Treaty, the 1960 Treaty applied only "to Dollar Bonds
whose issuers have their seat in the area of applicability to the
Validation Law."

G.    The Settlement Offer For The Bonds.

49.    In 1958, the West German obligors on the Bonds made a
settlement offer on the Bonds.  The offer applied only to 35.5% of the
debt, which corresponded to the percentage of debt from primary
obligors located in West Germany at the time.  The FBPC noted that
"[t]he bonds of bondholders who accept this alternative will be returned
to them after appropriate stamping and will thereafter evidence their

claim for the balance owed by the banks located outside the Federal Republic." *Id.*

50.   The FBPC considered Germany's guarantee in determining whether or not to recommend that holders of the Bonds accept the creditors' settlement offer.   The FBPC's papers include a 1959 memorandum confirming that holders of the Bonds have a claim against Germany based on its 1938 guarantee of the Bonds, regardless of whether the issuer was located in or out of what was then West Germany.   The FBPC's papers further opined that Germany's profits from the guarantee could be sufficient to repay all obligations on the Bonds, including debt originating from issuers located outside the territory of the Federal Republic of Germany in 1953.

H.   Germany Repeatedly Recognizes Its Obligation For The Country's Pre-World War II Debts.

51.   Over the last fifty years, Germany has repeatedly recognized its obligation for its pre-war external debt, including debts of its political subdivisions, such as the State of Prussia.

52.   Germany has similarly taken the position that local public debts "were considered to attach to the territory in question," requiring

"the successor State [to honor] the obligations of the predecessor State." Germany further stated that "a succession of States did not as such affect the rights of creditors."

53.     Germany agreed in the Unification Treaty of 1990 that upon unification of East and West Germany, "the Federal Republic of Germany shall take over the sureties, guarantees and warranties assumed by the German Democratic Republic."   As part of the Unification Process, Germany also received the territory covering the East German provincial and communal debt and guarantees of the State of Prussia represented by the Bonds.

54.     The Unification Treaty further provided that the Validation procedures would not apply to debt originating from issuers located outside the territory of the Federal Republic of Germany in 1953. Germany's official legal commentary to the Unification Treaty states that the reason for non-extension was that the purpose of the Validation Law was deemed to be fulfilled as of unification.

55.     In 1994, Germany represented to the public in an official filing with the United States Securities and Exchange Commission that

it is the successor to and is identical with the German Reich (i.e., the pre-World War II German state) under public international law. Germany further represented that bondholders should look to it for payment on the Bonds.  Germany submitted this statement to the United States Securities and Exchange Commission and the public with the intent that it would be relied upon by the Commission and by bondholders.  This action not only confirmed Germany's obligations but served to toll and revive any applicable statute of limitations.

56.    On information and belief, Germany has acted in other ways that explicitly recognize it has assumed the obligations under the Bonds.

57.    On information and belief, Germany has acted in other ways that recognize that the Validation Law is not applicable to debt originating from issuers located outside the territory of the Federal Republic of Germany in 1953.

I.    The Assenting Bondholders Under The London Debt Accord Are Paid.

58.    As part of the London Debt Accord "offer and settlement" scheme, bondholders who accepted the settlement offer on the Bonds

received "conversion bonds." These conversion bonds were not paid in full until at least 1994.

59.    Through its actions and agreements, Germany has repeatedly tolled and revived the applicable statute of limitations period for enforcing the Bonds.  Germany's actions and agreements include, but are not limited to: statements, at least as recently as February 1994, acknowledging and confirming Defendant's payment obligations under the Bonds renewing the twenty-year statute of limitations applicable to the enforcement of bonds through February 2014; deferral of the claims herein pursuant to agreement and the enactment of law; concealment of its guaranty; and international treaties.

60.    Germany's actions and agreements include, but are not limited to, its denial of the existence of any explicit acts whereby Germany assumed liability on the Bonds.  Upon information and belief, Germany made these denials despite the existence of the 1938 guaranty agreement, which was lawfully made by the German government.

J.    <u>Payment On The Bonds Has Been Refused</u>.

61.    Mortimer demanded payment on the Bonds from Germany and the Defendant Issuing Banks.  Payment has been refused.

62.    Germany and Defendant Issuing Banks have rendered any additional demands futile.

63.    Mortimer and Fulwood are not required to validate their bonds.  Even if Mortimer and Fulwood were to consider validating the Bonds, there is currently no Validation Board constituted in Germany or in the United States.  As a result of recent litigation, Germany has purportedly created an ad hoc "examining authority" for holders of external debt but the examining authority is not properly constituted and violates the provisions of the Validation laws.

<u>COUNT I</u>

64.    Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 through 63 above as if fully set forth herein.

65.    Plaintiff Mortimer holds 1611 of the bearer Bonds with coupons from December 1944 through maturity that are subject to payment in equivalent value of gold coin of the United States existing on June 1, 1928.

66.    Plaintiff Fulwood holds 83 of the bearer Bonds with coupons from December 1944 through maturity that are subject to payment upon demand in equivalent value of gold coin of the United States existing on June 1, 1928.

67.    The Defendant Issuing Banks are the successors to some or more of the original bond issuers and are liable for the original bond issuers' obligations.

68.    Defendant Germany has guaranteed, succeeded to, and/or assumed liability for the outstanding and unpaid principal and interest under the Bonds.

69.    Defendant Germany is, as a matter of international law, the successor to territory that was improved by projects funded by proceeds of the Bonds, to the political subdivisions of the pre-World War II German Reich, to the pre-World War II German Reich, and to East Germany.

70.    The Bonds are due and unpaid and therefore are in breach and default.

71.    Payment on the Bonds has been refused.

72.     Germany and the Defendant Issuing Banks are thus in breach of, and in default on, their obligations to pay principal and interest on the Bonds and are liable for the outstanding and unpaid principal and interest due under the Bonds.

73.     The total outstanding and unpaid principal and interest under the Bonds is currently estimated to exceed $7 billion and continues to increase.

## COUNT II

74.     Plaintiffs repeat and incorporate by reference the allegations contained in Paragraphs 1 through 74 above as if fully set forth herein.

75.     Plaintiff Mortimer holds 1611 of the bearer Bonds with coupons from December 1944 through maturity that are subject to payment upon demand in equivalent value of gold coin of the United States existing on June 1, 1928.

76.     Plaintiff Fulwood holds 83 of the bearer Bonds with coupons from December 1944 through maturity that are subject to payment upon demand in equivalent value of gold coin of the United States existing on June 1, 1928.

77.   Germany issued a written guaranty agreement that requires it to pay claims for interest and amortization of the loans if the obligors failed to do so.   This guaranty was made for mutual consideration and is legally enforceable.   Plaintiffs are beneficiaries under the guaranty agreement.

78.   Plaintiff Fulwood did not and could not have learned of the existence of the guaranty upon exercise of reasonable diligence until February 17, 2009.   Plaintiff Mortimer did not and could not have learned of the existence of the guaranty upon exercise of reasonable diligence until July 2010.   Germany has consistently denied and concealed the existence of this or any other written guaranty or agreement upon which it is liable for the Bonds.

79.   Germany is thus in breach of the guaranty and is liable for the outstanding and unpaid principal and interest under the Bonds.

80.   The total outstanding and unpaid principal and interest due under the Bonds is currently estimated to exceed $7 billion and continues to increase.

WHEREFORE, Plaintiffs Mortimer and Fulwood demand judgment against Defendant Germany and the Defendant Issuing Banks as follows:

A.    A judgment against Defendant Germany in the full amount of all outstanding and unpaid principal and interest due on the Bonds in equivalent value of gold coin of the United States existing on June 1, 1928, in a total amount to be proven at trial but currently estimated to exceed $7 billion;

B.    A judgment against the Defendant Issuing Banks for the outstanding and unpaid principal and interest due on the Bonds in equivalent value of gold coin of the United States existing on June 1, 1928, corresponding to each individual Defendant Issuing Bank's share of the total proceeds of the underlying loan, in an amount to be proven at trial;

C.    Attorneys fees and the other costs of this action; and

D.    Such other and further relief as this Court deems just and proper.

Dated:  September 10, 2010                    Respectfully submitted,

                                                  /s/     John Fornaciari
                                            John Fornaciari (BBO #175040)
                                            BAKER & HOSTETLER LLP
                                            Washington Square, Suite 1100
                                            1050 Connecticut Avenue, N.W.
                                            Washington, D.C.  20036
                                            Telephone:    202-861-1500
                                            Facsimile:     202-861-1783
                                            Email:   jfornaciari@bakerlaw.com

                                            Counsel for Plaintiffs Mortimer Off
                                            Shore Services, Ltd., and Ronnie
                                            Fulwood

Of Counsel:

Peder A. Garske
Mark A. Cymrot
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: 202-861-1500
Facsimile:  202-861-1783