UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 10-11551-RWZ


MORTIMER OFF SHORE SERVICES, LTD.,
and RONNIE FULWOOD

v.

FEDERAL REPUBLIC OF GERMANY, *et al.*


MEMORANDUM OF DECISION

March 28, 2012

ZOBEL, D.J.

Plaintiffs Mortimer Off Shore Services, Ltd. ("Mortimer"), and Ronnie Fulwood

("Fulwood") bring this action against the Federal Republic of Germany ("FRG") and five

German banks[1] ("Defendant Banks") claiming a right to recover the accrued principal

and interest on 1,694 German pre-World War II agricultural bonds.  This is the second

lawsuit by each plaintiff against the FRG.

FRG and the Defendant Banks have each moved to dismiss: FRG on the

grounds of res judicata, improper venue, and failure to state a claim upon which relief

can be granted (Docket # 23); the banks for lack of subject matter jurisdiction, lack of

personal jurisdiction, improper venue, issue preclusion, and failure to state a claim

---

[1] The banks are: (1) Norddeutsche Landesbank Girozentrale (alleged successor to
Hannoveresche Landeskreditanstalt), Docket # 1 ¶ 10; (2) HSH Nordbank AG (alleged successor to
Landesbank der Provinz Schleswig Holstein), id. ¶ 11; (3) WestLB AG (alleged successor to Landesbank
der Rheinprovinz, and Landesbank der Provinz Westfalen), id. ¶ 12; (4) Helaba Landesbank Hessen-
Theuringen (alleged successor to Nassauische Landesbank), id. ¶ 13; and (5) LBBW Landesbank Baden-
Wuerttemberg (alleged successor to Badischer Sparkassen und Giroverband, and Wuerttembergischer
Sparkassen und Giroverband), id. ¶ 14.

(Docket # 12).

## I. Background

To evaluate defendants' motions to dismiss, I accept as true the facts alleged in the complaint (Docket # 1) and also consider documents incorporated therein (either directly or by reference), matters susceptible to judicial notice, and matters of public record. Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008).

Some historical background is necessary to understand the issues raised by these motions. Since other courts have detailed the historical and legal background as it relates to these issues raised in this case, see Mortimer Off Shore Servs, Ltd. v. Fed. Republic of Germany, 615 F.3d 97, 99-103 (2d Cir. 2010) [hereinafter "Mortimer I"] and authorities cited therein, I rely on and incorporate that background and recite only that which is relevant to the disposition of defendants' motions to dismiss.

### A. German History

After World War I, the German Reich was made up of several states or Länder, the largest of which was Prussia, that encompassed territory later comprising both West and East Germany. Mortimer I, 615 F.3d at 100. When the Nazi Party rose to power in 1933, the Third Reich formally abolished the Länder parliaments and became a centralized totalitarian state. Id. "In 1949, four years after World War II ended, the western eleven Länder that were controlled by France, the United Kingdom, and the United States merged to form West Germany, a market economy, and the five Länder in the eastern sector occupied by the Soviet Union became East Germany, a communist Eastern block state that remained under the Soviet Union's political and

2

military control." Id. at 100-01.  In 1990, West and East Germany reunited to create the present-day FRG.  Id. at 101.

The FRG is allegedly "identical to the pre-World War II German Reich and is the legal successor to its political subdivisions, including the State of Prussia ('Prussia') and the German Democratic Republic ('East Germany')." Docket # 1 ¶ 9.  It is a foreign state as defined in the Foreign Sovereign Immunities Act ("FSIA"),[2] 28 U.S.C. § 1603(a). Id.

### B.  The Agricultural Bonds and Obligor Banks

According to the complaint, Mortimer is a Cyprus company and holder of 1,611 bearer bonds entitled "German Provincial & Communal Bank Consolidated Agricultural Loan US $1000 Secured Sinking Fund Gold Bond Series A 6 1/2%-Due June 1958" ("the Agricultural Bonds" or "the bonds").[3]  Fulwood is a Florida resident and holder of 83 Agricultural Bonds.  The bonds have an aggregate face amount of $25,000,000, a 30-year term, and coupons providing for interest payments twice a year.  The bonds were "listed on the New York Stock Exchange and marketed in New York."  Principal and interest was "payable" in Boston, New York City, or Chicago.  Plaintiffs allege that their bonds currently exceed $7 billion in value.

The bonds were issued in 1928 by fourteen German "provincial and communal"

---

[2] The FSIA, which is the "sole source for subject matter jurisdiction over any action against a foreign state," Capital Ventures Intern. v. Republic of Argentina, 552 F.3d 289, 293 (2d Cir. 2009); 29 U.S.C. § 1330(a), provides that a foreign state "shall be immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, unless one of the FSIA's exceptions applies, 28 U.S.C. §§ 1605-07.

[3] The background discussed in Parts I.B -I.C is based on the complaint, except where otherwise noted.

banks ("the obligor banks") to raise money to rebuild Germany's post-World War I agricultural infrastructure.  Docket # 1 ¶ 19; Mortimer I, 615 F.3d at 99.  The obligor banks contracted for the loans underlying the issuance of the Agricultural Bonds and lent the bond proceeds to German farmers.  Some of the obligor banks were located in what later became known as West Germany and some were located in what became known as East Germany.  The bonds are the obligations of the obligor banks and their "guarantors and successors."  Each obligor bank is allegedly liable for "a portion of the debt on each bond proportionate to its share of the total proceeds of the underlying loan. . . ."  Obligor banks located in what were West Germany and East Germany are liable for 35.5 and 64.5 percent of the Agricultural Bond debt, respectively. Mortimer I, 615 F.3d at 100; Docket #1 ¶ 25, 49; Declaration of Dr. Matthias Lang ¶ 4(a), Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, No. 05-10669-GEL (S.D.N.Y July 17, 2006), ECF No. 12 [hereinafter "Lang Decl."].  Each Defendant Bank is alleged to be a successor to an obligor bank located in West Germany.[4] Docket # 1 ¶¶ 10-14, 25;

---

[4] The Lang Declaration, on which Mortimer relied in its opposition to the FRG's motion to dismiss the New York suit, see infra Part I.D, states that obligor banks located in East Germany are liable for 64.5% of the bond debt and then identifies those seven obligor banks that were located in East Germany: (1) Landesbank der Provinz Ostpreußen, (2) Provinzialbank Pommern, (3) Provinzialhilfskasse für diē Provinz Niederschlesien, (4) Brandenburgische Provinzialbank und Giro-Zentrale, (5) Sächsische Provinzialbank, (6) Provinzialbank Oberschlesien, and (7) Provinzialbank Grenzmark Posen Westpreußen Giro-Zentrale.  Lang Decl. ¶¶ 4(a)-(b).  See also U.S. v. Bellow, 194 F.3d 18, 23 (1st Cir. 1999) (geographic locations are not generally controversial and thus within the general definition of a fact susceptible to judicial notice under Fed. R. Evid. 201(b))

Plaintiffs' complaint in this case lists each of the fourteen obligor banks by name and states its proportionate share of the total proceeds of the underlying loan.  Docket # 1 ¶ 25.  Removing from the list those banks that were located in East Germany yields the seven obligor banks that were located in West Germany (and whose collective debt obligation adds up to 35.5%): (1) Hannoversche Landeskreditanstalt (14.5%); (2) Landesbank Der Provinz Schleswig Holstein (8%); (3) Landesbank Der Rheinprovinz (3%); (4) Landesbank Der Provinz Westfalen (3%); (5) Nassauische Landesbank (2%); (6) Badischer Sparkassen Und Giroverband (3%); and (7) Wurttembergisher Sparkassen Und Giroverband (2%).  The complaint identifies each of the five Defendant Banks as a successor to one or two of the original West German obligor banks. See id. ¶¶ 10-14 and note 1, supra.

Lang Decl. ¶ 4(b).

The State of Prussia allegedly guaranteed payment on the Agricultural Bonds. In 1933, the Third Reich suspended payment on the Agricultural Bonds and began repurchasing them.  Plaintiffs allege that in October 1938, "Germany issued a written guarantee of payment on all principal and interest" of the bonds ("the 1938 Guaranty").

During World War II, it became impossible to present the bonds "to the American trustees or paying agents for cancellation"; consequently, "German bank vaults held large numbers of reacquired, yet uncancelled foreign currency bonds, in negotiable form, that no longer represented valid obligations." Mortimer I, 615 F.3d at 101 (internal quotation marks and citations omitted).  See also Docket # 1 ¶ 33.  "After Germany surrendered in 1945, Russian occupation forces seized and returned to circulation many such bonds, with an estimated total face value of $350,000,000, while bona fide purchasers possessed approximately $250,000,000 in valid bearer bonds." Mortimer I, 615 F.3d at 101.  "The invalid, but uncancelled bearer bonds posed a significant problem, both domestically and internationally, as there was a real possibility" that the holders of the looted bonds would share the available assets equally with legitimate bondholders. Id. at 101 (internal quotation marks and citations omitted).

### 1.  The Validation Law and Accompanying 1953 Treaty

Concern over the redemption of looted bonds led West Germany to pass the so-called Validation Law of August 25,1952, pursuant to which it allegedly assumed liability for certain specified foreign currency bonds – including the Agricultural Bonds –

issued before the end of World War II. Mortimer I, 615 F.3d at 101-02 and n.4.  The

Validation Law requires that, before payment may be had, the bonds must be

"registered, submitted along with relevant evidence, and validated after an

administrative hearing by a Board for the Validation of German Bonds in the United

States ("Validation Board") in Germany or the country of offering."  Id. at 102.

In 1953, the United States, West Germany, and various other Western allied

nations signed a treaty ("the 1953 Treaty") which incorporated by reference the 1952

Validation Law.  Id. That law and treaty were "part of the overall process of quelling

uncertainty about, and facilitating the 'orderly settlement of,' debts owed by territory

that became West Germany after World War II." Id.

### 2.  The London Debt Accord

The London Debt Accord ("LDA") was negotiated contemporaneously with the

Validation Law and the 1953 Treaty and was signed by West Germany, the United

States and several other nations, but not East Germany. Id.  It "represented the

culmination of the parties' settlement negotiations respecting West Germany's pre-

World War II external debts." Id.  Under the system set up by the LDA, "German

debtors and creditor committees would negotiate an 'offer and settlement' for various

debt instruments covered by the London Debt Accord," including the Agricultural

Bonds.  The LDA did not repeal the validation requirements nor did it "obligate West

Germany, after reunification, to compensate holders of bonds issued in what became

East Germany after reunification." Id. Mortimer I, 615 F.3d at 102.

Plaintiffs allege, however, that the LDA system was "strictly voluntary," and that

the Validation Law's requirements applied only to those bondholders who chose to accept an offer of settlement.  According to plaintiffs, the LDA merely prevented a non-validating bondholder from bringing an "action to recover on those bonds until after all creditors who accepted the settlement offer were paid in full."  Plaintiffs similarly allege that the 1953 Treaty "did not bar any creditor from asserting his or her rights, but rather was intended to ensure that Germany settled and paid claims on validated bonds before satisfying other obligations."  They cite to "published media reports" - including a 1958 New York Times article - allegedly confirming the "voluntary nature of the London Debt Accord and the 1953 Treaty."  They allege that both the LDA and the 1953 Treaty did not apply to obligations originating with debtors who were outside of West Germany, and describe the Validation Law as "designed to implement the London Debt Accord's voluntary settlement scheme for assenting creditors."

### 3.  The 1960 Treaty and the Unification Treaty

In 1960, the United States and West Germany executed a treaty that extended the Validation Law to certain categories of bonds issued in territory that became East Germany, but not to Agricultural Bonds issued in East Germany. Mortimer I, 615 F.3d at 102-03.  "On August 31, 1990, West Germany and East Germany signed the Unification Treaty reuniting the two nations into the present-day Federal Republic of Germany. . . . Subject to certain limitations, West Germany's then-existing laws and legal obligations continued to be valid and were extended to the former East Germany[.]" Id. at 103.  Plaintiffs allege that these limitations kept the Validation Law from applying to bonds that were issued in East Germany.  Id. at 103; Docket # 1 ¶ 48.

### C.  Plaintiffs' Claims

Plaintiffs allege that "payment on the Bonds has been refused" and that the bonds are "due and unpaid and therefore are in breach and default."

The complaint contains two counts for payment of the unpaid principal and interest on the Agricultural Bonds.  Count I, which plaintiffs describe as "Breach of Bonds," is against Defendant Banks – as alleged successors to the obligor banks – and the FRG – as alleged guarantor of and/or successor to the bond obligations.  Count II is against the FRG for breach of the 1938 Guaranty.  Fulwood and Mortimer claim that they "did not and could not have learned of the existence of the guaranty upon exercise of reasonable diligence" until February 17, 2009 and July 2010, respectively.  They allege that "Germany has consistently denied and concealed the existence of this or any other written guaranty or agreement upon which it is liable for the Bonds."

Plaintiffs have not validated their bonds.

### D.  Procedural Background

Neither Mortimer nor Fulwood is new to this game.  Mortimer sued the Federal Republic of Germany in 2005 in the Southern District of New York [hereinafter, "the New York suit"], seeking payment of principal and interest on 351 of the 1,611 Agricultural Bonds Mortimer purports to enforce here. Docket # 1 ¶ 6; Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, No. 05-10669-GEL, 2007 WL 2822214, at *1 (S.D.N.Y Sept. 27, 2007).  After finding that the FSIA's "commercial

activity exception," 28 U.S.C. § 1605(a)(2),[5] rendered the FRG subject to suit, the

district court allowed Germany's motion to dismiss the complaint for failure to state a

claim because Mortimer had not validated its bonds as required by the 1953 Treaty and

the Validation Law incorporated therein.  2007 WL at *6-7.

On appeal the Second Circuit affirmed, holding that Mortimer could not seek to

enforce its claim to the bonds issued in territory that became West Germany ("the West

German bonds") without first complying with the Validation Law's requirements.

Mortimer I, 615 F.3d at 99.  With respect to Mortimer's claim to enforce the bonds

issued in East Germany ("the East German bonds"), the circuit court affirmed on the

alternative ground that "Mortimer has failed to make the threshold showing necessary

to invoke the commercial activity exception to the FSIA, and therefore subject matter

jurisdiction is lacking [as to the East German bonds]."  Id. at 113.  The Second Circuit

rejected Mortimer's contention that the FRG had assumed an obligation on the East

German bonds through succession and various other "acts of recognition."

Specifically, the court held that:  (1) "automatic assumption of liability by a successor

state, even if established, would not meet the requirements of the FSIA's commercial

activity exception"; and (2) Mortimer presented no evidence "that East Germany and

the FRG explicitly assumed liability for any East German Agricultural Bonds, unlike

West Germany, which affirmatively and unequivocally assumed liability for valid West

---

[5] Section 1605(a)(2) states, in relevant part, that a foreign sovereign is not immune where "the action is based [i] upon a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

German Agricultural Bonds by enacting the Validation Law and subsequent treaties[.]" Id. at 109.

Mortimer petitioned for panel rehearing, citing, among other things, its "recent discovery" of the 1938 Guaranty of which it claimed it became aware only five days before the Second Circuit issued its decision. Plaintiff-Appellant-Cross-Appellee's Petition for Panel Rehearing at 3, Mortimer I, No. 08-1783 (2d Cir. Aug. 9, 2010). The Second Circuit denied the petition without opinion on August 20, 2010. Order, Mortimer I, No. 08-1783 (2d Cir. Aug. 20, 2010). Mortimer filed this complaint three weeks later. It subsequently petitioned for writ of certiorari in the New York suit, which was denied. Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, 131 S.Ct. 1502 (U.S. Feb. 22, 2011).

Fulwood filed a complaint against the Federal Republic of Germany and several other defendants[6] in the Middle District of Florida in 2005 to recover on certain German "Dawes" and "Young" bonds[7] sold in the United States. Complaint, Ronnie D. Fulwood v. Fed. Republic of Germany [hereinafter "Fulwood I"], 8:05-01490-SDM-TGW (M.D. Fla. Aug. 10, 2005), ECF No. 1. The case was voluntarily dismissed without prejudice on June 8, 2006. Order, Fulwood I, ECF No. 33.

## II. Discussion

---

[6] From the English translation provided on the court docket, the other defendants were the German Finance Ministry, the German Finance Agency, the Germany National Bank, and Peter Borawski.

[7] For a discussion of the history of these bonds, see World Holdings, LLC v. Fed. Republic of Germany, 794 F.Supp.2d 1305 (S.D. Fla. 2011).

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).  The facts pleaded must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id.  A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not suffice. Id.

Among other things, the FRG and Defendant Banks seek to bar plaintiffs' claims on the basis of claim and issue preclusion, respectively.  Claim preclusion (also referred to herein as the doctrine of res judicata) "bars the relitigation of any issue that was, or might have been, raised in respect to the subject matter of the prior litigation." Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994) (emphasis in original).  Issue preclusion, or collateral estoppel, "bars relitigation of any factual or legal issue that was actually decided in previous litigation between the parties, whether on the same or a different claim." Id. (internal quotation marks omitted) (emphasis in original). A litigant who was not party to a prior action may assert collateral estoppel. Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 771 (1st Cir. 2010) ("Mutuality is no longer strictly required for the application of collateral estoppel in federal courts."). Issue preclusion may be asserted "defensively [] by a defendant who 'seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant.'" Id. (quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.4

11

(1979)).       Claim or issue preclusion may be considered on a motion to dismiss

under Rule 12(b)(6).  <u>In re Colonial Mortgage Bankers Corp.</u>, 324 F.3d 12, 16 (1st Cir.

2003).  Dismissal on such grounds is appropriate if two conditions are met: (1) "the

facts that establish the defense must be definitively ascertainable from the allegations

of the complaint, the documents (if any) incorporated therein, matters of public record,

and other matters of which the court may take judicial notice"; and (2) "the facts so

gleaned must conclusively establish the affirmative defense." <u>Id.</u>

### A.  FRG's Motion to Dismiss: Claim Preclusion Analysis

Federal law determines whether an earlier federal court judgment bars the

maintenance of a subsequent federal court action. <u>Id.</u>  Under federal law, for claim

preclusion to apply there must be: "(1) a final judgment on the merits in an earlier

action; (2) an identity of the cause of action in both the earlier and later suits; and (3)

an identity of parties or privies in the two suits." <u>Havercombe v. Dep't of Ed. of the Com.</u>

<u>of Puerto Rico</u>, 250 F.3d 1 (1st Cir. 2001) (quoting <u>Kale v. Combined Ins. Co. of</u>

<u>America</u>, 924 F.2d 1161, 1166 (1st Cir. 1991)).  For ease of discussion, I address these

factors in reverse order.

### 1.  Identity of the Parties

Both Mortimer and the FRG were parties to the New York suit.  Fulwood was not.

The First Circuit has "cautioned the district courts to tread gingerly in applying res

judicata to nonparties," noting the "real perils" of nonparty preclusion, including due

process concerns implicit in denying a party his day in court. <u>Gonzalez v. Banco</u>

<u>Central Corp.</u>, 27 F.3d 751, 757 and n.4 (1st Cir. 1994).  Nevertheless, the FRG urges

the court to bar Fulwood's claims against it, contending that plaintiffs are forum-shopping, and that, since Fulwood shares counsel with Mortimer and holds a relatively small number of bonds (83 out of 1694 at issue), "Fulwood is merely a stalking horse for Mortimer and was injected into the suit to try to avoid the application of the doctrines of [claim and issue preclusion] against Mortimer."  Docket # 24 at 8.

The First Circuit has suggested that nonparty preclusion might be warranted to prevent "manipulation, including claim-splitting, suits by proxy, and forum-shopping." Gonzalez, 27 F.3d at 757.  While plaintiffs' timing in filing this suit (less than three weeks after the Second Circuit denied Mortimer's petition for rehearing), and the identical nature of the two suits (as described below) is brow-raising, the record before me does not provide sufficient evidence that Fulwood either vicariously participated in or substantially controlled Mortimer's litigation of the New York action to justify preclusion of his claims here.  Id. at 758 (nonparty preclusion appropriate where nonparty participated vicariously in the original litigation by exercising control of the named party or having the opportunity to do so); id. at 759 (inquiry into whether nonparty had substantial control is case-specific and depends on the facts).

Thus, I evaluate only whether Mortimer's claims are res judicata against the FRG, and separately consider whether the FRG's alternative arguments for dismissal bar Fulwood's claims.[8]

## 2.  Identity of the Cause of Action

"A single cause of action can manifest itself in an outpouring of different claims,

---

[8] See infra Part II.B.

based variously on federal statutes, state statutes, and the common law." <u>Kale</u>, 924

F.2d at 1166.  For res judicata purposes, causes of action are identical if those various

claims concern the "same operative nucleus of fact," or the "new complaint grows out of

the same transaction or series of connected transactions as the old complaint[.]" <u>Id.</u>

(internal quotation marks and citations omitted).  <u>See also</u> <u>Muniz Cortes v. Intermedics,</u>

<u>Inc.</u>, 229 F.3d 12, 15 (1st Cir. 2000) ("fact that appellants advanced different legal

theories does not undermine the identity of causes" where both claims arose from the

same underlying facts).

Mortimer's claims against the FRG here and in New York indisputably arose out

of the same operative nucleus of facts; namely, Mortimer's alleged purchase of

Agricultural Bonds and the FRG's alleged assumption of liability for the bonds.  Even

the theories of recovery are the same.  As in New York, Mortimer argues that the FRG

assumed liability over the bonds through succession and by taking affirmative "acts of

recognition" that render it subject to suit under FSIA's commercial activity exception.

<u>Compare</u> <u>Mortimer I</u>, 615 F.3d at 111 and n.14 (describing how Mortimer's amended

New York complaint proposed various "acts of recognition" by which the FRG allegedly

"repeatedly recognized its obligations for the pre-war external debt of the German

Reich and the [s]tate of Prussia")[9], <u>with</u> Docket # 1 ¶ 2 (alleging that "Germany is liable

---

[9] In the New York suit, Germany alleged that the following documents or actions constituted such "acts of recognition": (1) the Unification Treaty; (2) a March 6, 1951 letter from German Chancellor Konrad Adenauer to Andre François-Poncet, Chairman, Allied High Commission; (3) German letter to the Office of Chief Counsel at the U.S. Securities Exchange Commission; (4) Germany's formal takeover of East Germany.  <u>Mortimer I</u>, 615 F.3d at 111 and n.14.  The Second Circuit considered whether each of these documents or actions constituted an "affirmative act" conferring liability for the East German bonds upon Germany and held that none did so.  <u>Id.</u> at 111-113.  The court likewise rejected Mortimer's "successor state" theory of liability. <u>Id.</u> at 109-10.

on the bonds under a written guaranty, under explicit assumptions and declarations,

and as a successor obligor and guarantor under United States and international law.")

and id. ¶¶ 51-57 (citing various documents and acts that allegedly demonstrate how

Germany has "repeatedly recognize[d] its obligations for the country's pre-World War II

debts").[10]  Mortimer also alleges, as it did in New York, that it is entitled to recover

because it need not comply with the validation procedures for various reasons.

Compare Mortimer I, 615 F.3d at 115-16 (describing and rejecting Mortimer's

arguments that the Validation Law is no longer in effect and that the law's requirements

were abrogated once all bondholders who assented to a settlement offer under the LDA

had been compensated), with Docket # 1 ¶ 63 (alleging that plaintiffs are not required

to validate their bonds) and id. ¶ 42 (alleging that validation requirement only applied to

bondholders who settled under the LDA and that the law only required non-settling

bondholders to wait to recover until assenting bondholders had been compensated).

     Mortimer now claims that the 1938 Guaranty "changes the landscape of the

claim, as it is exactly the type of document that allows the Court to assert subject matter

jurisdiction." Docket # 25 at 18.  Still, this is nothing more than a claim that it has new

"proof" to support its theories from the New York suit.  Regardless of whether the 1938

Guaranty is classified as a new theory of recovery or a new fact, neither can overcome

the application of res judicata here.  Kale, 924 F.2d at 1166 ("[A] particular legal theory

---

[10]  Plaintiffs seek to have this court consider the same evidence of "acts of recognition"- save for
the 1938 Guaranty - that was already submitted to and ruled on by the Second Circuit. See Docket # 1 ¶
36-37 (March 6, 1951 representations by Chancellor Adenauer to Allied High Commission); id. ¶ 52
(citation of a purported German requirement that "the successor State [honor] the obligations of the
predecessor State"); id. ¶ 53 (Unification Treaty); id. ¶ 55 (Germany filing with the SEC).

not pressed in the original suit will nonetheless be precluded in the subsequent one if it prescinds from the same set of operative facts. . . . In this way, the law prevents a litigant from claim-splitting, requiring that he 'assert all his various legal theories and factually related allegations the first time he brings suit.'") (quoting <u>Rose v. Town of Harwich</u>, 778 F.2d 77, 79 (1st Cir. 1985)).

To avoid the application of res judicata, Mortimer must demonstrate that it could not have asserted its claims under the Guaranty during the pendency of the New York suit.[11] <u>Manego v. Orleans Board of Trade</u>, 773 F.2d 1, 3 (1st Cir. 1985) ("proper test for the applicability of <u>res judicata</u> is not whether the plaintiff in fact" argued his claims in the prior proceeding, "but whether he could have"); <u>id.</u> at 6 (approvingly noting district court reasoning that where a fact "<u>could have been asserted</u> during the prior suit, res judicata applied to bar its assertion in a later suit") (emphasis in original); <u>Brown v. Felsen</u>, 442 U.S. 127, 131 (1979) ("Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.").

---

[11] While Mortimer admits that it learned about the Guaranty five days before the Second Circuit issued its opinion, it did not put the issue of the Guaranty before the court until it filed its petition for panel rehearing. The FRG would like this court to find that res judicata applies because the Second Circuit, on Mortimer's rehearing petition, "had the opportunity to consider Mortimer's 1938 Guaranty argument and found it wanting[.]" Docket # 30 at 5.

Again, the timing of Mortimer's actions is curious. But, given the doctrinal requirement that there be a final judgment "on the merits" for claim preclusion to apply, and that the Second Circuit denied Mortimer's petition without opinion, the court will not use the circuit court's denial of Mortimer's rehearing petition to preclude Mortimer from raising the 1938 Guaranty issue here. <u>See</u> <u>Alpha/Omega Ins. Servs. Inc. v. Prudential Ins. Co. of Am.</u>, 272 F.3d 276, 281 ("Our denial of a motion for panel rehearing does not amount to a decision on the merits."); <u>Moore v. Anderson</u>, 222 F.3d 280, 284 (7th Cir. 2000) (summary denial of petition for rehearing does not explain the basis for the denial and is therefore "insufficient to confer any implication or inference regarding a court's opinion relative to the merits of a case"); <u>cf.</u> <u>Fernandez v. Chardon</u>, 681 F.2d 42, 51 n.7 (1st Cir. 1982) (denial of petition for rehearing has no precedential effect).

Mortimer pleads that it "could not have learned of the existence of the [1938 G]uaranty upon exercise of reasonable diligence until July 2010." Docket # 1 ¶ 78. It proffers two supporting declarations, attached to its opposition to Germany's motion to dismiss: one from Sami Zayat, a director of the company, Docket # 25 Ex. A (Zayat Decl.), and another from Dieter K. Braun, a self-described "consultant and researcher regarding all issues related to the German Gold Bonds." Docket # 25 Ex. B ¶ 1 (Braun Decl.).  Zayat notes Mortimer's "diligent efforts to obtain all reasonably available material and information regarding the Bonds," to wit: its retention of legal counsel in both the United States and Germany; its search of "publicly available databases and archive indices"; and its "communicat[ion] with German officials, as well as other individuals knowledgeable about the history of the Bonds." Zayat Decl. ¶¶ 2-5.  Zayat claims that Mortimer was unaware of the Guaranty until Mr. Braun informed it that he had "discovered the written guaranty by accident among numerous boxes at an archives at a university in the United States" while Braun was "researching other bonds not involved in this case."  Id. ¶ 7.

Braun states that he "discovered" the 1938 Guaranty "by accident" while researching in the archives at Stanford University. Braun Decl. ¶ 4.  He claims that the "Stanford archives is the only place where the document is present in the United States" and that the Guaranty is "not publically available in Germany," presumably because the "logical place to find such a document might be in the public German Government archives" and he "did not find the 1938 Guaranty by reviewing the legal databases and indexes in Germany relating to those archives."  Id. ¶ 5. Finally, he

17

claims that there was "no reasonable way to search for the document" because "Germany has always denied the existence of any written guaranty of the Bonds." Id. ¶ 6.   In its opposition, Mortimer argues that Braun "has examined countless indices of archives documents, and never saw even a reference to the 1938 Guaranty before he discovered the document in the library of Stanford University." Docket # 25 at 16.

Putting aside the issue of Mr. Braun's bona fides,[12] Mortimer's own pleadings in this case and its filings in the Southern District of New York belie its claims of blameless ignorance.   Three times the complaint references papers or testimony from the "Foreign Bondholders Protection Council ("FBPC")"[13] which plaintiffs describe as "a quasi-public agency established by the United States government ostensibly to protect American holders of foreign Government bonds." Docket # 1 ¶ 44.[14]   In paragraph fifty, they allege the following:

> The FBPC considered Germany's guarantee in determining whether or not
> to recommend that holders of the Bonds accept the creditors' settlement
> offer.   The FBPC's papers include a 1959 memorandum confirming that

---

[12] The FRG notes, and plaintiffs admit, that Braun and Fulwood have a longstanding relationship.

[13] The council's proper name is the Foreign Bondholders Protective Council.   It was a private, not-for-profit corporation created by statute in 1933 with the support of the U.S. government to negotiate settlements with defaulting sovereign debtors on behalf of American bondholders.   Lee C. Buchheit, The Role of the Official Sector in Sovereign Debt Workouts, 6 Chi. J. Int'l L. 333, 337 (2005); Rory MacMillan, Towards a Sovereign Debt Work-out System, 16 Nw. J. Int'l L. & Bus. 57, 84 (1995).

[14] See also Docket # 1 ¶ 44 (alleging that the FBPC "confirmed the voluntary nature of the London Debt Accord, as well as its limited geographic scope, in testimony before the Senate Foreign Relations Committee and in its public representations."); id. ¶ 49 ("The FBPC noted that '[t]he bonds of bondholders who accept [a settlement offer] will be returned to them after appropriate stamping and will thereafter evidence their claim for the balance owed by the banks located outside the Federal Republic.'").

holders of the Bonds have a claim against Germany based on its 1938 guarantee of the Bonds, regardless of whether the issuer was located in or out of what was then West Germany. The FBPC's papers further opined that Germany's profits from the guarantee could be sufficient to repay all obligations on the Bonds, including debt originating from issuers located outside the territory of the Federal Republic of Germany in 1953.

Docket # 1 ¶ 50 (emphasis added).  Mortimer claims to have been ignorant of the 1938 Guaranty until July 2010, yet cites to a reference to the Guaranty in an FBPC memo from 1959 and other FBPC papers.  By Mortimer's own description, the reference is more than just a passing one; indeed, the FBPC memo "confirm[s]" that bondholders "have a claim against Germany based on [the 1938 Guaranty]."

Mortimer does not claim to have been ignorant of the existence of FBPC papers during the pendency of the New York suit.  Nor could it: as early as March 2007, it relied on FBPC documents to oppose Germany's motion to dismiss the New York action.  On March 2, 2007, Mortimer filed a letter with the Southern District in supplemental opposition to Germany's motion to dismiss.  See Letter Addressed to Judge Gerard E. Lynch from Peder A. Garske, Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, No. 1:05-10669-GEL (S.D.N.Y. Mar. 2, 2007), ECF No. 32.  In the letter Mortimer argues, among other things, that the 1953 Treaty only covered obligor banks located in West Germany and, in support, quotes from and cites to a "Report for the Years 1958 through 1961, Foreign Bondholders Protective Council, Inc. (Excerpt attached as Exhibit F)."  Mortimer continued to rely on FBPC papers, citing to them for factual support in its proposed amended New York complaint.  See Amended Complaint, Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, No. 1:05-

10669-GEL (S.D.N.Y. Mar. 2, 2007), ECF No. 23 Ex. 1 at ¶ 20.

Even assuming that the 1938 Guaranty itself could not have been located before July 2010, Mortimer cannot plausibly claim that the 1959 memo and other FBPC papers referencing the Guaranty were similarly unavailable.[15]  Any attempt by Mortimer to argue as much is simply not credible given Mortimer's prior discovery of and reliance on the FBPC's papers. That Mortimer <u>did not</u> find the memo earlier is not evidence that it <u>could not</u> have done so.  Mortimer may not now introduce the 1938 Guaranty to defeat the application of res judicata here.

### 3. Final Judgment on the Merits

The New York judgment was "final" for res judicata purposes after the Southern District issued its opinion and order dismissing Mortimer's claims. 18A Charles Alan Wright, et al., <u>Federal Practice and Procedure</u> § 4432 (2d ed. 2011) (judgment has preclusive effect while appeal is pending). Since the Second Circuit dismissed Mortimer's claims to the East German and West German bonds for different reasons (lack of subject matter jurisdiction and failure to state a claim, respectively), I analyze each part of the <u>Mortimer I</u> decision separately to determine whether it was made "on the merits."

### a.  The West German Bonds

---

[15] Mortimer's claims of reasonable diligence are additionally suspect, as a simple Google search for "Foreign Bondholders Protective Council" reveals that FBPC records from 1933 to the late 1980s are housed at the Stanford University Libraries Department of Special Collections and University Archives – the same university library system where Mr. Braun "discovered" the 1938 Guaranty. <u>See</u> http://findingaids.stanford.edu/xtf/view?docId=ead/mss/m1287.xml (describing the library's collection as consisting of "negotiation files for each country [FBPC] staff were monitoring" and "administrative records typical of a non-profit organization, such as Articles of Incorporation and bylaws, board correspondence, minutes, financial statements, and reports") (last visited March 27, 2012).

The Second Circuit affirmed the district court's dismissal of Mortimer's claims to the West German bonds for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Mortimer I, 615 F.3d at 99, 103.  Such a dismissal constitutes an adjudication on the merits.  Fed. R. Civ. P. 41(b) ("Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule–except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19–operates as an adjudication on the merits.").[16]  Thus, Mortimer's claims against the FRG with respect to the West German bonds are barred.

### b.  The East German Bonds

"A dismissal for lack of subject matter jurisdiction is not considered to be 'on the merits,' and therefore is without res judicata effect." Muniz Cortes v. Intermedics, Inc., 229 F.3d 12, 14 (1st Cir. 2000).  Still, while res judicata may not bar a court from adjudicating a claim that was dismissed for lack of subject matter jurisdiction, the doctrine of collateral estoppel "precludes relitigation of the issues determined in ruling on the jurisdictional question."  Id. See also Coors Brewing Co. v. Mendez-Torres, 562 F.3d 3, 9 (1st Cir. 2009) (same), abrogated on other grounds by Levin v. Commerce Energy, Inc., 130 S.Ct. 2323 (2010); 18A Charles Alan Wright, et al., Federal Practice and Procedure § 4436 (2d ed. 2011) ("Although a dismissal for lack of jurisdiction does not bar a second action as a matter of claim preclusion, it does preclude relitigation of

---

[16] Plaintiffs dispute that the decision was a "final judgment on the merits" because "the Second Circuit did not adjudicate any claim concerning the 1938 Guaranty on the merits.  That Guaranty was not raised, and could not have been raised, to the original Second Circuit panel."  Docket # 32 at 2.  Their claims for relief under allegedly "new" evidence – the 1938 Guaranty – has no effect on whether the Second Circuit's decision was a "final judgment on the merits."  Their argument is properly related to the question of the identity of the causes of action in the two suits, which, as explained above, are the same.

the issues determined in ruling on the jurisdiction question. . . . The provision in Rule

41(b) that dismissal for lack of jurisdiction does not operate as an adjudication on the

merits is not intended to change this result."). I must therefore evaluate the preclusive

effect of the <u>Mortimer I</u> decision with respect to the East German bonds through the

lens of issue, and not claim, preclusion.[17]

Whether collateral estoppel applies is conditioned on whether the party against

whom it is asserted "received a full and fair opportunity to litigate [his] claims" in the

first proceeding. <u>Enica v. Principi</u>, 544 F.3d 328, 337 (1st Cir. 2008). In this regard, the

FRG must establish the following: "(1) the issue sought to be precluded must be the

same as that involved in the prior action; (2) the issue must have been actually

litigated; (3) the issue must have been determined by a valid and binding final

judgment; and (4) the determination of the issue in the prior proceeding must have

been essential to the judgment." <u>Grella</u>, 42 F.3d at 30.

Issues are identical for collateral estoppel purposes if "the matter raised in the

second suit is identical in all respects to that decided in the first proceeding." <u>Faigin v.</u>

<u>Kelly</u>, 184 F.3d 67, 78 (1st Cir. 1999) (quoting <u>C.I.R. v. Sunnen</u>, 333 U.S. 591 599-600

(1948)) (internal quotation marks omitted). "The issues must be defined by reference

---

[17] "It may seem paradoxical to suggest that a court can render a preclusive judgment when dismissing a suit on the ground that the suit does not engage the jurisdiction of the court. But the paradox is superficial. A court has jurisdiction to determine its own jurisdiction. A ruling that it lacks jurisdiction is therefore entitled to preclusive effect. The only difference, though it is not trivial . . . is that a judgment on the merits precludes relitigation of any ground within the compass of the suit, while a jurisdictional dismissal precludes only the relitigation of the ground of that dismissal, and thus has collateral estoppel (issue preclusion) effect rather than the broader res judicata effect that nowadays goes by the name of claim preclusion." <u>Okoro v. Bohman</u>, 164 F.3d 1059, 1063 (7th Cir. 1999) (internal citations omitted).

to the judicial determinations at stake." Id. The relevant issue here is whether the commercial activity exception to the FSIA applies to render the FRG subject to suit with respect to the East German bonds.  It is undisputed that the Second Circuit reached a valid, binding, final judgment on this issue, that the issue was actually litigated, and that the determination of the issue was essential to the court's holding and judgment.[18]

Mortimer would have the court define the issue much more narrowly; that is, whether the 1938 Guaranty is evidence of an affirmative assumption by the FRG over liability for the East German bonds.  As explained above, this additional "evidence" was available to Mortimer during the pendency of the New York suit.  It cannot now try to relitigate the issue of subject matter jurisdiction on the basis of this so-called "new" fact. Restatement (Second) of Judgments § 27, cmt. c (1982) ("An issue on which relitigation is foreclosed may be one of evidentiary fact, of 'ultimate fact' (i.e., the application of law to fact), or of law. . . . Thus, for example, if the party against whom preclusion is sought did in fact litigate an issue of ultimate facts and suffered an adverse determination, new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact. . . .  And similarly if the issue was one of law, new arguments may not be presented to obtain a different determination of that issue.").

Plaintiffs further argue that the facts and issues here are not identical to those in the New York case because this case raises issues of Massachusetts law not argued in

---

[18] In reaching its decision on this issue, the Second Circuit considered Mortimer's "successor state" theory and whether certain "acts of recognition" constituted an "affirmative act" by Germany over the East German portion of the debt so as to bring Germany within the commercial activity exception to FSIA.  See supra Part I.D and notes 9-10.

the New York case; namely, whether Defendant Banks violated their repayment

obligations under Massachusetts law and improperly unilaterally modified the terms of

the Bonds.  Mortimer is barred from asserting this argument now since the issues could

and should have been raised in the New York suit. See Kale, 924 F.2d at 1165 (holding

that "when a plaintiff pleads a claim in federal court, he must, to avoid the onus of

claim-splitting, bring all related state claims in the same lawsuit so long as any suitable

basis for subject matter jurisdiction exists").

Mortimer also argues that it held only 351 Agricultural Bonds during the New

York suit and it now holds 1,344 additional Agricultural Bonds which were not the

subject of the New York action.  Given that the bonds are of identical issue, this is a

distinction without a difference.  Finally, plaintiffs argue that they now proffer additional

evidence – not considered in the New York action – about the alleged "voluntary"

nature of the 1953 Treaty, Validation Law, and London Debt Accord, i.e., statements

from the Foreign Bondholders Protective Council and various published media reports.

This additional evidence could have and should have been presented in the New York

suit and plaintiffs do not even attempt to claim that such evidence was previously

unavailable to them.

For the aforementioned reasons, Mortimer's claims to the East German bonds

are barred.

**B. Fulwood's Claims Against the FRG**

Although Fulwood's claims against the FRG are not barred under the doctrine of

res judicata, he fails to state a claim to the West German bonds because he has not

complied with the requisite validation procedures.  See Docket # 1 ¶ 63; Mortimer I, 615 F.3d at 99.

The viability of Fulwood's claims to the East German bonds is subject to the court's determination that it has subject matter jurisdiction.  The FRG has not waived its argument that it is immune from suit with respect to the East German bonds; neither has it briefed whether plaintiffs' allegations concerning the 1938 Guaranty are sufficient to establish an affirmative act by Germany to bring it within the "commercial activity exception" of the FSIA and thereby give the court subject matter jurisdiction.  The court will reserve on that question until it has the benefit of the FRG's briefing on this issue.

### C. Defendant Banks' Motion to Dismiss

Plaintiffs' claims against Defendant Banks fail as a matter of law.[19]  Defendant Banks are all successors to West German debt, which the Second Circuit undisputedly determined is subject to the validation requirement.  Since Mortimer had a full and fair opportunity to litigate the applicability of the Validation Law to its claims on the West German bonds in the New York suit, it is collaterally estopped from relitigating that issue against the Defendant Banks here.  See Blonder-Tongue Labs., Inc. v. Univ. of Ill.

---

[19]  Plaintiffs invoke the court's subject matter jurisdiction under the FSIA, 28 U.S.C. § 1330, and the court's supplemental jurisdiction, 28 U.S.C. § 1367.  Defendant Banks move to dismiss for lack of subject matter jurisdiction under these statutes. Although the Supreme Court has declared that the courts should generally first determine whether subject matter jurisdiction under Article III of the Constitution exists before reaching the merits of a plaintiff's claim, see Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 92 (1998), since the subject matter jurisdiction issue here relates to statutory and not Article III jurisdiction, the subject matter jurisdiction question need not preclude my evaluation of the merits. Kelly v. Marcantonio, 187 F.3d 192, 197 (1st Cir. 1999) (holding that appellate court remains free to bypass problematic jurisdictional issue, provided it does not implicate Article III "case and controversy" requirement) (distinguishing Steel Co.).

Found., 402 U.S. 313, 328 (1971) (endorsing application of non-mutual defensive collateral estoppel where plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit); Acevedo-Garcia v. Monroig, 351 F.3d 547, 574 (1st Cir. 2003) (permitting litigants to assert collateral estoppel defensively "promotes efficiency by discouraging speculative lawsuits and conserving the resources of defendants").

Even if collateral estoppel did not apply, both Mortimer's and Fulwood's claims against the Defendant Banks fail on their merits.  As plaintiffs admit, the Defendant Banks are the "only successor banks still in existence in Germany" and they could not locate "any remaining successors to the East German Banks." Docket # 18 at 12, n.6. See also supra notes 1 and 4. Since the Second Circuit has already decided that the Validation Law and 1953 Treaty apply to West German debt, plaintiffs concede that the Defendant Banks hold only West German debt, and plaintiffs admittedly have failed to comply with the Validation Law, they fail to state a claim against the Defendant Banks.

## III.  Conclusion

Defendant Banks' Motion to Dismiss (Docket # 12) is ALLOWED.  Defendant Federal Republic of Germany's Motion to Dismiss (Docket # 23) is ALLOWED as to plaintiff Mortimer, ALLOWED as to plaintiff Fulwood's claims to the West German bonds, and DEFERRED as to Fulwood's claims to the East German bonds, pending supplemental briefing by the FRG on whether Fulwood has sufficiently pled facts to establish that the 1938 Guaranty was an "action . . . based upon a commercial activity," 28 U.S.C. § 1605(a)(2), that, if proven, would give rise to subject matter jurisdiction. The FRG shall file an additional brief on this issue by April 13, 2012.  Fulwood may

submit an opposition by April 30, 2012.  Neither brief shall exceed 15 pages in length.

Plaintiffs' Motion for Leave to Supplement the Record on Their Opposition as to

Defendants' Motion to Dismiss (Docket # 36) is DENIED.


|  |  |
|---|---|
| _____March 28, 2012_____ | _____/s/Rya W. Zobel_____ |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |